# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER GUZZI, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 10-1112 |
| JOSEPH MORANO and | : | |
| U.S. BENEFIT PARTNERS LLC, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S. J.                                           August 7, 2013

 Currently pending before the Court is a Motion for Summary Judgment by Defendants

Joseph Morano and U.S. Benefit Partners LLC. For the following reasons, the Motion is granted

in part and denied in part.

## I. FACTUAL BACKGROUND

 The facts are highly disputed in this case, making it difficult for the Court to provide any

clear recitation of the relevant events. Nonetheless, the Court has attempted to decipher the

factual history of this case based on the varying versions of events provided by the parties as

supported by the evidence of record,[1] with the hope of narrowing the issues for trial, if one

becomes necessary.

### A. The Parties

 Plaintiff Peter Guzzi is an individual residing in Doylestown, Pennsylvania. (Am.

Compl. ¶ 2, Answer ¶ 2.) Defendant Joseph Morano is an individual residing in Secaucus, New

---

[1] To the extent a party offers a factual statement either without citation to any evidence or
with non-specific citation to a large document, the Court disregards it.

Jersey (Am. Compl. ¶ 3, Answer ¶ 3.)  Defendant U.S. Benefit Partners, LLC ("USBP") is a New

Jersey limited liability company with its principal place of business in Secaucus, New Jersey.

(Am. Compl. ¶ 4, Answer ¶ 4.)  USBP is in the business of, among other things, selling insurance

policies through large marketing channels.  (Am. Compl. ¶ 16; Answer ¶ 16.)

### B. The Alleged Contract

In April 2005, Defendant Morano, Plaintiff Guzzi, and a gentleman named Robert

Gladstone were engaged in a phone conversation.  At that time, according to Plaintiff, Morano

offered Guzzi a one-third partnership in USBP.  (Pl.'s Opp'n Summ. J., Ex. A., Declaration of

Peter Guzzi ("Guzzi Decl.") ¶ 2, June 5, 2013.)  Plaintiff explained that the original purpose of

the phone conversation was to generally discuss the future of USBP.  (Defs.' Mot. Summ. J., Ex.

A at Interrogatory 8 & Ex. B, Resp. to Interrogatory 8.)  The three men then purportedly agreed

that they would each be a one-third partner and that they were each going to get one-third of the

profit for the platforms and people they brought to USBP.  (Defs.' Mot. Summ. J., Ex. K,

Deposition of Peter Guzzi ("Guzzi Dep."), 52:2–20, 54:17–55:4, Sept. 21, 2012.)[2]  This was

solely an oral agreement (the "Agreement").  (Id. at 55:5–6.)  Plaintiff's obligations under the

Agreement were to utilize his efforts so that USBP could enter into contracts to sell Medicare

insurance products on behalf of other companies and so that USBP could make contacts with

agents and distribution channels to sell the Medicare insurance products.  (Guzzi Decl. ¶ 3;

Defs.' Mot. Summ. J., Ex. B, Resps. to Interrog. No. 9; see also Pl.'s Opp'n Summ. J., Ex. C,

Deposition of Robert Gladstone ("Gladstone Dep."), 19:8–11, Oct. 16, 2012.)

---

[2] Notably, when later asked who the members of USBP were in 2005 and 2006, Guzzi indicated that they included himself, Lisa Morano, Rob Gladstone, and Joe Morano.  (Id. at 56:4–20.)

Morano and Gladstone's characterizations of this meeting, however, are markedly different. Gladstone indicated that he was present at a meeting between Plaintiff, Morano, and himself in early 2005. (Defs.' Mot. Summ. J., Ex. D, Declaration of Robert Gladstone ("Gladstone Decl."), ¶ 2, July 27, 2011.) According to his recollection, Morano never offered either Gladstone or Plaintiff a one-third interest in USBP. (Id. ¶¶ 2–3.) Likewise, Morano remarked that, other than his wife, he had never had any business partners in USBP. (Defs.' Mot. Summ. J., Ex. E, Declaration of Joseph Morano ("Morano Decl."), ¶ 7, Feb. 19, 2013.) He went on to note that he never offered Plaintiff a one-third interest in USBP. (Id. ¶ 10.) Moreover, as revealed by Plaintiff's own testimony, Plaintiff never received a K-1 form—which is a profit distribution for shareholders form—nor did he ever sign a membership interest agreement, a stock member agreement, or a shareholders agreement with Morano and USBP. (Guzzi Dep. at 90:12–24, 91:1–5.)

Nevertheless, from April 2005 to March 2007, Plaintiff, in purported furtherance of the Agreement, worked approximately ninety hours per week over the course of six to seven days per week. (Guzzi Decl. ¶ 10; Defs.' Mot. Summ. J., Ex. B, Resp. to Interrogatory No. 9.) The total compensation he received over the almost two years he worked for USBP was approximately $40,000. (Guzzi Decl. ¶ 11.) Plaintiff claims that he accompanied Morano, on behalf of USBP, on at least four business trips—paid for by Morano and/or USBP entirely—for the purpose of negotiating contracts to sell Medicare insurance policies with companies such as Conseco, Pacificare, and Humana. (Guzzi Decl. ¶¶ 12–16; Gladstone Dep. 31:9–24, 48:25–49:9; Morano Dep. 66:24–67:9.) At these meetings, Morano introduced Plaintiff as his "partner." (Guzzi Decl. ¶ 14.) Gladstone clarified that, although Morano did, on occasion, introduce Plaintiff and

himself as his partners, "[i]t was just a way of introduction, nothing more than that."  (Gladstone Dep. 45:25–46:17.)

### C. <u>Plaintiff's Securing of High Level Contracts</u>

According to Plaintiff, from April 2005 to March 2007, he was involved in negotiating and closing contracts to sell insurance policies with, *inter alia*, Humana, Conseco, and Pacificare. (Defs.' Mot. Summ. J., Ex. B, Resp. to Interrogatory No. 10.)  The evidence as to each of these alleged contracts, however, is in dispute.

#### 1. <u>Humana</u>

With respect to Humana, Plaintiff stated in his Responses to Defendants' Interrogatories that he secured the Humana contract in approximately August/September 2005.  (Defs.' Mot. Summ. J., Ex. B., Response to Interrogatory No. 5.)  The contract was initially to sell Medicare Advantage plans, but eventually evolved into general health insurance as well.  (<u>Id.</u>)  Plaintiff claimed that he "[u]sed [his] credentials, experience and reputation within the insurance industry to facilitate meetings and negotiations between U.S. Benefit Partners, LLC and Humana and participated in said meetings and negotiations on behalf of U.S. Benefit Partners, LLC."  (<u>Id.</u>)  According to Plaintiff, he dealt with Jimmy Wenger at Humana, as well as other individuals whose identity he could not recall.  (<u>Id.</u>)  Plaintiff was unable to provide a value for each contract.  (<u>Id.</u>)

The other evidence of record, however, tells a different story.  Mr. Gladstone could not remember whether Plaintiff recruited Humana and knew only that he was "part of the meetings with them."  (Gladstone Dep. 49:14–51:18.)  Defendant Morano unequivocally attested to the fact that "Plaintiff did not procure a contract between USBP or myself and Humana."  (Murano

Decl. ¶ 21.)  Finally, James Wenger, Plaintiff's purported contact at Humana, indicated that prior

to his dealings with Mr. Morano and USBP in 2006, he had never met Plaintiff.  (Defs.' Mot.

Summ. J., Ex. F, Affidavit of James Wenger ("Wenger Aff.") ¶ 6, Oct. 18, 2012.)  He went on to

explain that he met Peter Guzzi through Morano and USBP sometime in Tampa, Florida in 2006,

and that Morano did not introduce Guzzi as his partner.  (Id. ¶¶ 6–7.)  Additionally, he averred

that (1) he had no idea what type of relationship Guzzi had with Morano and USBP; (2) he did

not believe Guzzi and Morano to have been partners; and (3) he had no idea whether Guzzi had

any ownership interest in USBP and had no reason to believe Guzzi ever had an ownership

interest in USBP.  (Id. ¶¶ 7–12.)  Finally, Wenger indicated that Humana decided to work with

USBP based upon Morano's reputation in the insurance industry.  (Id. ¶ 5.)

## 2.  Conseco and Pacific Life

As to Conseco, Plaintiff again stated in his Responses to Interrogatories that he secured

the USBP Field Marketing Organization contract with Conseco sometime in 2006.  (Defs.' Mot.

Summ. J., Ex. B, Resp. to Interrogatory No. 10.)  He indicated that he "[u]sed [his] credentials,

experience and reputation within the insurance industry to facilitate meetings and negotiations

between U.S. Benefit Partners, LLC and Conseco and participated in said meetings and

negotiations on behalf of U.S. Benefit Partners, LLC."  (Id.)  Notably, however, Plaintiff could

not recall his contact person's name or with whom he negotiated.  (Id.)  Nor could he value the

contract.  (Id.)  Mr. Gladstone confirmed that Plaintiff was at a meeting where USBP and

Conseco discussed a marketing contract.  (Gladstone Dep. 48:29–49:9.)

As to Pacific Life, Plaintiff gave almost identical responses.  He remarked that he used

his "credentials, experience and reputation within the insurance industry" to facilitate the

meetings and negotiations that resulted in the Field Marketing Organization contract with Pacific Life in July 2005. (Defs.' Mot. Summ. J., Ex. B, Resp. to Interrogatory No. 10.) Again, however, he was unable to provide a contact person's name or a contract value. (Id.)

Defendant Morano, on the other hand, unequivocally averred in his Declaration that Plaintiff did not procure a contract between USBP or himself and Conseco or Pacific Life. (Morano Decl. ¶¶ 20, 22, 23.) In fact, at his deposition, Morano stated that USBP never had a Field Marketing Organization contract with Conseco and that he himself procured the contract with Pacific Life without any involvement from Plaintiff. (Morano Dep. 65:5–22.) According to Defendants, there is no other record evidence that Plaintiff had any significant role in securing the Conseco or Pacific Life contracts.

### D. Securing of Distribution Channels

Plaintiff also alleges that from April 2005 to March 2007, he recruited multiple agents and distribution channels for the purposes of selling insurance policies through USBP, including Brian Fillweber of Inner Circle Marketing, Stacey Price, and James Read of JRM Benefit Consultants, LLC. (Defs.' Mot. Summ. J., Ex. B., Resp. to Interrogatory No. 11, Guzzi Dep. 63:5–20.)

#### 1. Brian Fillweber

With respect to Brian Fillweber, Plaintiff claims that he established a relationship with him at the end of 2006/beginning of 2007. (Defs.' Mot. Summ. J., Ex. B., Resp. to Interrogatory No. 11.) Plaintiff worked to get Fillweber and his company Inner Circle Marketing to use their marketing platform to promote USBP's Medicare Advantage Products. (Id.) According to Plaintiff, Mr. Fillweber procured approximately 8,000 new applicants, for which USBP was to

receive $550 commission for each new applicant, plus $225 per annual renewal for up to ten years, equating to approximately $4,400,000 in commissions for new applicants and approximately $18,000,000 in renewal commissions.  (Id.)  Notably, both Mr. Gladstone and Mr. Murano admitted that Plaintiff introduced Mr. Fillweber to Morano.  (Gladstone Dep. 36:16–21, 50:15–18; Morano Dep. 22:12–23:5.)

Again, however, Defendants' body of evidence presents a conflicting versions of events. Brian Fillweber's own Declaration indicated that, between 2002 and 2006, he had recruited Plaintiff and subsequently appointed him to work underneath him in his hierarchy of insurance agents [3] to sell primarily under-65 life insurance and related products.  (Defs.' Mot. Summ. J., Ex. G, Declaration of Brian Fillweber ("Fillweber Decl.") ¶ 3, Jan. 31, 2013.)  Sometime during that period, Plaintiff recruited Morano to work underneath him within the hierarchy for insurance agencies to sell the same types of products.  (Id. ¶ 4.)  Fillweber met Morano in late 2006 or early 2007.  (Id. ¶ 5.)  Fillweber did not know whether Morano had been appointed in Plaintiff's downline either individually or through his company USBP.  (Id. ¶ 6.)  Likewise, Fillweber indicated that he was not aware and did not have any specific knowledge that Plaintiff had an ownership interest in USBP.  (Id. ¶ 7.)  Fillweber went on to state that neither he nor any of his companies, including Inner Circle Marketing, LLC and Safeway Financial, LLC, were ever

---

[3]  As explained by Morano, in the health insurance industry, sales are performed through a pyramid shaped hierarchy.  (Morano Decl. ¶ 15.)  Thus, a health insurance agency would enter into an agreement—generally known as a Field Marketing Organization Agreement ("FMO") or a Master General Agent Agreement ("MGA")—with an insurance company.  (Id.)  Once an agent or agency has an FMO or MGO, the agent, agency, and all of its subordinate agents are permitted to sell those products, as long as they are licensed properly and certified (if required).  (Id.) When an agent of the agency that has the FMO or MGA with the health insurance carrier appoints an agent or agency underneath it, that is called the agent's/agency's "downline, "which is a term of art in the industry.  (Id.)

appointed under either USBP or Morano to sell health insurance, except to the extent of the 1Medicare, LLC relationship, where Safeway Financial, LLC, was contracted under Mr. Morano with the Wellpoint family of companies to sell only Medicare insurance products.  (Id. ¶¶ 11–12.) Fillweber never worked individually, or through any other company, to sell and/or market health insurance products, other than Medicare Insurance Products, on behalf of Morano or USBP.  (Id. ¶¶ 13–14.)  Crucially, Mr. Fillweber unequivocally stated that Plaintiff "had no role in the procurement of the relationship entered into between Mr. Morano and myself in November 2007, which resulted in the formation of 1Medicare, LLC."  (Id. ¶ 15.)

### 2.    Stacey Price and James Read

With respect to the two other identified distribution channels, Stacey Price and James Read of JRM benefits Consultants ("JRM"), Plaintiff claimed to have established these relationships in May 2005 and November 2005–February 2006 respectively.  (Defs.' Mot. Summ. J., Ex. B., Resp. to Interrogatory No. 11.)  With respect to both, he explained that these channels were procured so that they would use their marketing platforms to promote USBP's Medicare Advantage Products.  (Id.)  Gladstone believed that Plaintiff may have recruited Ms. Price and Mr. Read, and Mr. Fillweber because those were Plaintiff's contacts, but he was not entirely sure.  (Gladstone Dep. 49:18–50:2.)  Morano also admitted that Stacey Price was an agent that Plaintiff recruited and that his company may have received commissions or "overrides" from her work.  (Morano Dep. 68:19–69:7, 104:17–19.)

As before, however, Morano's Declaration flatly denied that Plaintiff produced a distribution channel with Stacey Price or with James Read of JRM on behalf of either USBP or himself.  (Morano Decl. ¶¶ 25–26.)  He also asserted that USBP did not benefit from JRM

Benefit Consultants, LLC or from Stacey Price as a result of Plaintiff's efforts.  (Id. ¶¶ 28–32.)

**E.      Plaintiff's Entitlement to Shared Profit of USBP**

In his Amended Complaint, Plaintiff alleges that he generated significant revenue for Defendants, but was not compensated pursuant to the alleged oral contract between himself and Morano/USBP.  (Am. Compl. ¶ 23.)  According to that Amended Complaint, Defendants wrongfully terminated that contract in March 2007, at which time he was owed commissions and/or salary in excess of $175,000.  (Id. ¶¶ 20, 25.)  In support of this alleged agreement, Plaintiff notes that USBP issued a 1099 form to Plaintiff for at least the year of 2005 indicating that there was some level of agreement.  (Pl.'s Opp'n Summ. J., Ex. E.)  Defendants also admitted that Plaintiff was an independent contractor that worked for USBP, which, according to Plaintiff, reflects some type of a contract and agreement between himself and USBP.  (Id., Ex. J, Resp. to Interrogatory No. 10.)  Plaintiff goes on to note that USBP's profits increased significantly between 2005 and 2006, due in part to Plaintiff's generation of sales for Medicare Advantage.  (Id., Ex. E.)  When asked about the basis for his estimated income, however, Plaintiff indicated that the question was difficult to answer because he did not directly sell products, but rather worked at getting the agents aboard.[4]  (Guzzi Dep. 94:2–96:24.)

In response, Defendants contend that Plaintiff provides no documentation or proof as to the amount of money allegedly owed to Plaintiff and the purpose for which it is owed.  They claim that there is no record evidence demonstrating commission structures, commission

---

[4] Plaintiff also argues that Defendants "refused to provide any documents or information regarding the finances of Morano or USBP, other than tax returns, to . . . the amount of gross proceeds and the genesis of the proceeds which is essential for determin[ing] whether to pierce the corporate veil, whether Mr. Guzzi was owed commission and whether Mr. Guzzi is still owed any unpaid commissions."  (Pl.'s Opp'n Summ. J. 7 (citing Id., Exs. M, N, O, P).)

distribution agreements, contracts with carriers, amounts paid or received for insurance contracts, renewals, or policies written or cancelled. (Defs.' Mem. Supp. Mot. Summ. J. 16.) As Plaintiff admitted in his deposition, his entire work history from 2002 to 2012—other than a brief six-month period with a different organization where he received W-2 income—resulted in only 1099 income. (Guzzi Dep. 39:9–18, 41:3–12.) He also emphasized that the money he got from USBP was not salary, such as an employee would receive, but rather commissions or profits as they were earned. (Id. at 93:6–22.) Finally, Plaintiff admitted that he never received partnership documents from USBP or Morano:

> Q.  Did you ever ask Mr. Morano for a K-1 during the time from 2005 to 2008, 2009
> A.  A K-1?
> Q.  Yes.
> A.  No idea what that is.
> Q.  Do you know if you ever received a K-1 from Mr. Morano?
> A.  What's a K-1?
> Q.  A profit distribution, shareholders distribution.
> A.  Oh. No.
> Q.  You never received one?
> A.  I don't believe so, no.

(Guzzi Dep. 90:12–24.)

### F.  The Relationship Between Defendant Morano and Defendant USBP

Plaintiff asserts that Defendant Morano intermingled funds from USBP and did not treat the corporation separately from himself. (Guzzi Dep. 120:2–24.) For example, from April 2005 to March 2007, Morano, individually and/or on behalf of USBP, paid for and provided advertising and lead sources for the recruitment of potential agents. (Guzzi Decl. ¶ 17.) Specifically, he would pay for telemarketing companies to generate lists of potential insurance agents, which would then be forwarded to Plaintiff to contact and recruit. (Id. ¶¶ 18–20.)

Moreover, Morano personally paid for a membership at the Pyramid Club in 2006 for Plaintiff's use in furtherance of the Agreement in order to recruit agents and contracts. (Gladstone Dep. 66:20–67:3; Pl.'s Opp'n Summ. J., Ex. E at 00002–00003.) Morano, on the other hand, has attested to the fact that he always operated USBP as a separate and distinct entity from himself and has not ever commingled his personal funds with those of USBP. (Morano Decl. ¶¶ 12–13.)

### G. Procedural History

On March 15, 2010, Plaintiff initiated the present litigation. Following some initial motion practice, Plaintiff filed a First Amended Complaint on March 18, 2011, setting forth three causes of action. Count I alleges breach of contract. (Id. ¶¶ 31-34.) Count II claims a violation of the Pennsylvania Wage Payment and Collection Law, 43 Pa.C.S. § 260.2a. (Id. ¶¶ 35-42.) Finally, Count III seeks an accounting of the precise sums owed to Plaintiff under the aforementioned contract. (Id. ¶¶ 43-46.) Plaintiff further alleges that Defendant Morano intermingled USBP's corporate funds with his own funds and diverted corporate funds for his own use, thereby making USBP his "alter ego." (Id. ¶ 27.) Accordingly, Plaintiff asserts that the corporate veil should be pierced, making Defendant Morano personally liable for any breach of contract by USBP. (Id. ¶¶ 28-29.)

On May 22, 2013, Defendants filed their Third Renewed Motion for Summary Judgment, to which Plaintiff responded on June 7, 2013.[5] Defendants then filed a Reply Brief on June 24,

---

[5] Defendants contend that Plaintiff's Response was untimely because it was filed sixteen days after the Motion for Summary Judgment, two days outside of the fourteen-day time limit provided by Local Rule of Civil Procedure 7.1(c). That Rule states that a court may disregard an untimely response brief and conduct its own analysis of whether summary judgment is appropriate under Federal Rule of Civil Procedure 56. See E.D. Pa. Civ. R. 7.1(c).
  While the Court does not condone late filings and will not tolerate any repeated behavior from Plaintiff's counsel, we note that the brief was only two days outside the prescribed period.

2013, making the Motion ripe for judicial consideration.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving

Because of the dispositive nature of summary judgment proceedings and because Plaintiff's brief is helpful in the Rule 56 analysis, the Court will exercise its discretion to consider the brief despite its untimeliness. Kelvin Cryosystems, Inc. v. Lightnin, No. Civ.A.03-881, 2004 WL 2601121, at *2 (E.D. Pa. Nov. 16, 2004), aff'd 252 F. App'x 469 (3d Cir. 2007).

party, and "all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." <u>Id.</u> at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Elec.</u>, 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." <u>Berckeley Inv. Grp. Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. <u>Celotex</u>, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. <u>Anderson</u>, 477 U.S. at 249–50.

## III. DISCUSSION

Defendants seek summary judgment on the entirety of Plaintiff's Amended Complaint on the grounds that Plaintiff has failed to produce evidence in support of any of his claims. Specifically, they assert that (1) Defendant Morano has no personal liability under either an alter ego or participation theory for the breach of contract claim; (2) Plaintiff has not created a genuine issue of material fact as to his breach of contract claim; and (3) Plaintiff has no viable claim

under the Wage Payment and Collection Law.

## A.    Defendant Morano's Personal Liability for Breach of Contract

### 1.    Piercing the Corporate Veil

"'The law in Pennsylvania is clear that where a party enters into a contract with a corporation, no action will lie against the shareholders of that corporation individually for a breach of that contract.'" Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co., 700 F. Supp. 2d 720, 736 (W.D. Pa. 2010) (quoting First Realvest, Inc. v. Avery Builders, Inc., 600 A.2d 601, 603 (Pa. Super. Ct. 1991)). Nonetheless, shareholders, officers and directors of a corporation may be held liable under a theory of "piercing the corporation veil." Id. This theory applies equally to a limited liability company. Id. Although there is no clearly settled test for piercing the corporate veil, Pennsylvania courts have made clear that there is a "strong presumption" against doing so. Id. (quoting Adv. Tel. Sys. v. Com-Net Prof'l Mobile Radio, LLC, 846 A.2d 1264, 1277–78 (Pa. Super. Ct. 2004)). The court, however, should not hesitate to pierce the corporate veil "'whenever justice and public policy demand.'" Id. (quoting Adv. Tel. Sys., 846 A.2d at 1278). Alternatively, a court can disregard a corporate entity without a specific showing of "fraud, illegality or wrongdoing" so long as it is necessary to avoid injustice. Macready v. TCI Trans Commodities, A.G., No. Civ.A.00-4434, 2011 WL 4835829, at *6 (E.D. Pa. Oct. 12, 2011).

"Factors to be considered in piercing the corporate veil include:  (1) gross undercapitalization, (2) failure to observe corporate formalities, (3) substantial mingling of corporate and personal affairs, and (4) using the corporate form to perpetrate a fraud." Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp., 643 F. Supp. 2d 675, 695 (E.D. Pa. 2009); see

also Village at Camelback v. Carr, 538 A.2d 528, 533 (Pa. Super. Ct. 1988)) ("Thus, we inquire, *inter alia*, whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own."). These factors are not exhaustive and, as a general rule, courts generally apply a "totality of the circumstances test." Partners Coffee Co., 700 F. Supp. 2d at 737 (citing Plastipak Packaging, Inc. v. DePasquale, 75 F. App'x 86, 87–89 (3d Cir. 2003)). Notably, however, the situation must present "an element of injustice or fundamental unfairness." Trustees of the Nat'l Elevator Indus. Pension, Health Benefit of Educ. Funding v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003). The party seeking to pierce the corporate veil must provide clear and convincing evidence in favor of doing so. Siematic Mobelwerke, 643 F. Supp. 2d at 695. Given these standards, meeting the burden necessary to establish that a corporate entity is merely an alter ego of a particular shareholder, officer, or director is "notoriously difficult for plaintiffs." Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001).

In the present case, Plaintiff presents scant evidence to support piercing the corporate veil. Specifically, he argues that Morano personally paid for a membership at the Pyramid Club in Philadelphia so that Plaintiff could use it for the purpose of recruiting agents and/or for the purpose of procuring contacts. Moreover, he contends that Morano personally paid for Plaintiff to accompany him on trips to Florida, Chicago, and Las Vegas, the purpose of which was to procure contracts with Humana, Mr. Fillweber, Pacificare, and Conseco. Therefore, according to Plaintiff, "it certainly appears that Mr. Morano was not separating his personal funds from USBP's funds." (Pl.'s Opp'n Summ. J. 10.)

This evidence fails on multiple levels. First, a review of all of the evidence cited in support of these allegations reveals only that Robert Morano paid for the aforementioned items, not whether he did so out of his personal funds or USBP funds. As the controlling owner of USBP, it would not be unusual to for him to characterize the payments as coming from "him"—as opposed to USBP—or to see his name on credit card authorizations. No evidence exists that the funds actually came from Morano's personal accounts and not those of USBP. Moreover, even if Morano did use his own money on the transactions, there is no evidence that the converse is true—that Morano siphoned off corporate funds for his own personal use resulting in a substantial mingling of corporate and personal affairs. Nor has Plaintiff proven gross undercapitalization, any failure to observe corporate formalities, any lack of corporate record-keeping, or any use of the corporate form to perpetrate a fraud. Most importantly, Plaintiff has not set forth any element of illegality, unjustice, or unfairness that would result if the corporate veil were not pierced. Indeed, Plaintiff brings nothing more than a breach of contract claim and a claim for unpaid wages. Without any showing that USBP has been so undercapitalized by Morano that it could not satisfy its obligations should such a breach be found, Plaintiff has failed to establish any necessity for the Court to take the disfavored step of piercing the corporate veil.

In an alternate argument, Plaintiff asserts that despite multiple interrogatories and requests for the production of documents on this subject, Morano has steadfastly refused to disclose his own personal financial information and refused to prove account documents/information for both the business and his personal finances. Plaintiff goes on to contend that "[f]urther exploration into Defendants' financials . . . could certainly disclose further

commingling of funds." (Pl.'s Opp'n Summ. J. 10.) Such speculation is misplaced during summary judgment proceedings. Plaintiff had the benefit of a very lengthy discovery period. Cognizant of Defendants' objections to certain discovery requests, Plaintiff bore the burden of moving for an order either compelling Defendants to supply the requested documents or granting him an adverse inference. Having failed to do so, Plaintiff cannot now be heard to complain that he did not receive certain documents and is not entitled to any speculative inference that responsive discovery would be favorable to his case.

In short, Plaintiff has simply not met his heavy burden of establishing that Morano and USBP were alter egos. Accordingly, the Court declines to pierce the corporate veil.

## 2. **Participation Theory**

"[A] corporate officer can be held personally liable for a tort committed by the corporation when or she is sufficiently involved in the commission of the tort." N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp., No. 12-2296, 2013 WL 1095445, at *4 (3d Cir. Mar. 18, 2013); see also Key Corporate Capital, Inc. v. Tilley, 216 F. App'x 193, 195 (3d Cir. 2007) (recognizing that, pursuant to Pennsylvania law, "[u]nder the officer participation theory, corporate officers who take part in the commission of a tort by a corporation face personal liability."). Notably, "[u]nless the corporate officer extends promises in his individual capacity, the theory does not apply in the context of an action for breach of contract." Walsh v. Alarm § Grp., Inc., 95 F. App'x 399, 401 (3d Cir. 2004) (quotations omitted).

It is undisputed that this case involves no tort claims. As such, unless Morano extended promises to Plaintiff in his individual capacity, the participation theory would not apply. Plaintiff's argument in support of the participation theory is as follows:

In this matter, Mr. Morano could be personally liable for the Agreement—to be a one-third partner of USBP—as it was really made with both Defendants. Plaintiff entered into an agreement with USBP as a company to act in good faith to carry out his obligations under the contract. In addition, however, it is an agreement by and between the partners. Partners to a company contract with each other individually and not solely with the entity which they created. They enter into an agreement with each other to carry out each of their respective obligations to each other as well as to the company of which both individuals are partners. As such, in promising to reimburse Mr. Guzzi one-third of the gross proceeds resulting from his efforts, Mr. Morano was entering into that agreement on behalf of USBP and on behalf of himself of one partner to another.

(Pl.'s Opp'n Summ. J. 10.) Notably absent from Plaintiff's entire argument is any allegation or evidence that the alleged oral agreement involved any promises extended by Morano while acting in his individual capacity. Indeed, Plaintiff's own Declaration avers that Morano offered Plaintiff to be a one-third partner in USBP. (Guzzi Decl. ¶ 2.) By its very nature, this statement only suggests that Morano, acting as principal of USBP, offered Plaintiff a business interest in USBP and that USBP would pay Plaintiff from USBP funds. See Walsh, 95 F. App'x at 402 ("Whenever a corporation makes a contract, it is the contract of the legal entity—of the artificial being created by the charter—and not the contract of the individual members.") (quotation omitted). Plaintiff does not offer an iota of evidence that Morano personally or individually promised Plaintiff anything. Nor does Plaintiff explain how Morano personally participated in the breach of any contract. In short, Plaintiff's theory, accompanied by no citations to the record, is insufficient for the Court to impose personal liability on Defendant Morano for breach of contract.

### 3.    Conclusion as to Defendant Morano

Ultimately, the Court finds that Defendant Morano bears no liability for Plaintiff's breach of contract claim. Plaintiff has offered no evidence to establish that Morano and USBP are alter

egos of one another such that the Court would be justified in taking the extreme measure of piercing the corporate veil. Moreover, Plaintiff has not created any genuine issue of material fact as to whether Morano actually extended promises to Plaintiff in his individual capacity, such that Morano could be deemed to have "participated" in the breach of contact. Therefore, judgment is entered in favor of Morano and against Plaintiff on the breach of contract claim.

### B. USBP's Liability for Breach of Contract

The Court next turns to the claim at the heart of the present case—Plaintiff's breach of contract action against USBP. For a breach of contract claim, a plaintiff must show: (1) the existence of a contract; (2) breach of duty under that contract; and (3) resulting damages. Miller v. Thomas Jefferson Univ. Hosp., 908 F. Supp. 2d 639, 655 (E.D. Pa. 2012) (citing Lackner v. Glosser, 892 A.2d 21, 30 (Pa. Super. Ct. 2006)). Defendants now contend that, despite the extended discovery period, Plaintiff is unable to show (1) an agreement between himself and USBP or (2) damages resulting from breach of any such contract in the form of unpaid profits on contracts or distribution channels procured on behalf of USBP. The Court addresses each contention separately.

#### 1. Whether an Oral Contract Existed

"The burden of proving the existence of a contract lies with the party relying on its existence." Edmondson v. Zetusky, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996). "The elements of an enforceable contract under Pennsylvania law are: (1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently definite terms, and (3) an agreement supported by adequate consideration." Szymanski v. Sacchetta, No. Civ.A.10-2336, 2012 WL 246249, at *4 (E.D. Pa. Jan. 26, 2012) (citation omitted). The evidence supporting the existence

of such an oral contract must be "clear and precise." Luther v. Kia Motors Am., Inc., 676 F. Supp. 2d 408, 416 (W.D. Pa. 2009) (citing Martin v. Safeguard Scientifics, Inc., 17 F. Supp. 2d 357, 368 (E.D. Pa. 1998)); see also Feret v. First Union Corp., No. Civ.A.97-6754, 1999 WL 80374, at *15 (E.D. Pa. Jan. 25, 1999).

The first element, mutual intent to be bound by an agreement, usually manifests as "'an offer or proposal by one party followed by an acceptance by the other party.'" Bayliss–Allen v. Cadence Design Sys., Inc., No. Civ.A.99-3240, 2000 WL 1156857, at *4 (E.D. Pa. Aug. 16, 2000) (quoting Restatement (Second) of Contracts § 22(1) (1981)). In ascertaining intent, the object of the inquiry is not the parties' subjective intent, but rather "the intent a reasonable person would apprehend in considering the parties' behavior." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009). Where an oral contract is involved, "'courts must look to surrounding circumstances and course of dealing between the parties in order to ascertain their intent.'" Szymanski, 2012 WL 246249, at *4 (quoting Boyle v. Steiman, 631 A.2d 1025, 1033 (Pa. Super. Ct. 1993)).

With respect to the second element—sufficiently definite terms—Pennsylvania has adopted the Restatement (Second) of Contracts. Reed v. Pittsburgh Bd. of Pub. Educ., 862 A.2d 131, 135 (Pa. Commw. Ct. 2004). The Restatement provides as follows:

(1)    Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2)    The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

(3)    The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an

offer or as an acceptance.

Restatement (Second) of Contracts § 33 (1981). In other words, "[a]n enforceable contract requires an offer, acceptance, consideration and mutual meeting of the minds." Waterford Mortg. Co. v. Integrated Alarm Servs. Grp., Inc., No. Civ.A.06-3967, 2008 WL 4589630, at *3 (E.D. Pa. Oct. 14, 2008) (citation omitted). "The offer and the acceptance must include the essential terms that both parties intend to be binding." Id. Further, "[t]he essential terms must be definite enough to provide a basis for enforcing the agreement." Id. "If a court, due to indefiniteness or incompleteness, is unable to determine if a contract was performed, the court must find no contract existed in the first place." Reed, 862 A.2d at 135 (citing Restatement (Second) of Contracts § 33 cmt. c (1979)).

Ultimately, the question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question is for the jury to decide. Szymanski, 2012 WL 246249, at *4 (citation omitted); see also Quandry Solutions Inc. v. Verifone Inc., No. Civ.A.07-097, 2009 WL 997041, at *5 (E.D. Pa. Apr. 13, 2009). "[I]n the case of a disputed oral contract, what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact for the jury." Solomon v. Luria, 246 A.2d 435, 438 (Pa. Super. Ct. 1968). "Given that the intent of the parties to be bound is a requisite element of contract formation, 'oral contracts make it particularly difficult to extricate the matters of law from the questions of fact. Nevertheless, the allegation that an oral contract exists does not automatically entitle a plaintiff to a jury trial.'" Bennett v. Itochu Int'l, Inc., Nos. Civ.A.09-1819, 09-4123, 2012 WL 3627404, at *15 (E.D. Pa. 2012) (quoting Quandry, 2009 WL 997041). "Contract formation is a matter of law ripe for determination by

the Court if a binding contract could not exist under the undisputed set of facts." Id. (quotations

omitted). "The Court must determine whether a reasonable jury, considering the parties'

undisputed actions and words, could find that they formed a binding oral contract." Id.

In the present matter, notwithstanding the relative weakness of Plaintiff's evidentiary

submissions, the Court has little choice but to deny summary judgment on this cause of action.

With respect to the first element of a breach of contract claim, the Court finds that a genuine

issue of material fact remains as to whether an oral contract existed between Plaintiff and

Defendant USBP. Defendants contend that Plaintiff has been wholly unable to produce *any*

documents suggesting that there was any agreement between Plaintiff, Morano, and Gladstone

for Plaintiff to obtain one-third ownership in USBP. Defendants further cite to their own

deposition testimony and declarations and to the fact that Plaintiff never asked for or received a

K-1 form at any point during the time from 2005 to 2008.

While the Court would agree that Plaintiff's claim to an actual one-third partnership

stands on tenuous grounds, the Amended Complaint alleges only that "Plaintiff and Defendants

entered into an agreement whereby Defendants agreed to pay the Plaintiff one- third of USBP's

gross profits on distribution channels secured by the Plaintiff." (Am. Compl. ¶ 15.) Taking the

facts in the light most favorable to Plaintiff, a discussion occurred in April 2005, wherein

Morano, Plaintiff, and Gladstone agreed that they are each going to get one-third of profit for the

platforms and people they brought USBP. (Guzzi Dep. 52:2–20, 54:17–55:4.) According to

Plaintiff, his obligations under the Agreement were to utilize his efforts so that USBP could enter

into contracts to sell Medicare insurance products on behalf of other companies and make

contacts with agents and distribution channels to sell the Medicare insurance products. (Guzzi

Decl. ¶ 3; Def.'s Mot. Summ. J., Ex. B, Responses to Interrog. No. 9.) Indeed, Gladstone

testified that Plaintiff was responsible for recruiting agents for Medicare. (Gladstone Dep.

19:8–11.) Further, it is undisputed that USBP issued a 1099 form to Plaintiff for at least the year

of 2005 indicating that there was some level of agreement. (Pl.'s Opp'n Summ. J., Ex. E.)

Finally, Defendants seem to concede the fact that Plaintiff worked, in some capacity, for USBP.

There is no dispute that Plaintiff attended business meetings with Morano on behalf of USBP and

was given a membership at the Pyramid Club by Morano for the purpose of recruiting on behalf

of USBP. Certainly, based on these facts and circumstances, a reasonable jury could find that

some form of contractual arrangement existed between Plaintiff and USBP where Plaintiff was to

work on bringing in contracts and distribution channels to USBP and USBP, in turn, would

reimburse Plaintiff one-third of the profits on such contacts. While relatively weak, Plaintiff's

evidence suffices to create a genuine issue of material fact as to the existence of an oral contract

between Plaintiff and USBP.[6]

---

[6] Notably, Defendants' argument in their Motion for Summary Judgment fails to address
these issues of material fact. Instead, Defendants argue that they served nine requests for the
production of documents on Plaintiff seeking information regarding the breach of contract. In
response, Plaintiff provided thirty-four total documents and stated, "Plaintiff is still in the process
of locating and procuring documents. Once additional responsive documents are located, if any,
same will be provided to Defendants. Plaintiff reserves the right to supplement and/or amend
this response at a later date." (Defs.' Mem. Supp. Mot. Summ. J. 24–25.) Based solely on these
discovery responses, Defendants contend that "None of the documents provided by Plaintiff
show an agreement between Mr. Morano, Mr. Gladstone, and Mr. Guzzi; contracts and/or
distribution channels procured on behalf of USBP; or any damages from any alleged breach of
the contract for 1/3 ownership of USBP. . . . In fact, when asked in his deposition on September
21, 2012, Plaintiff stated that he was not issued any shares or membership certificates in U.S.
Benefit Partners." (Id. at 26.) This argument, while properly pointing out an absence of
documentary evidence, fails to address the testimonial evidence offered in the form of
depositions and affidavits.

## 2.    Whether Plaintiff Has Shown a Breach of the Oral Contract and Damages

As to the breach and damages elements of Plaintiff's breach of contract cause of action, his claim again survives summary judgment review.  As noted above, Plaintiff asserts that he secured three high-level contracts on behalf of USBP: Humana, Conseco, and Pacific Life.  Yet, according to Plaintiff's deposition testimony and Declaration, USBP has failed to give him his promised one-third share of the profits obtained from such contracts.

Defendants, on the other hand, provide their own deposition testimony and declarations indicating that Plaintiff had no role in securing these contracts or distribution channels.  With respect to the Humana contract, Defendants provided an affidavit from Plaintiff's alleged contact at Humana—James Wenger—who averred that Plaintiff did not procure the contract between USBP and Humana.  Moreover, Defendants' declarations flatly denied that Plaintiff produced any distribution channel with Fillweber, Price, or Read and rejected any notion that USBP benefitted from these channels as a result of Plaintiff's efforts.  Finally, Defendants produced a Declaration from Mr. Fillweber indicating that Plaintiff had no role in the procurement of the relationship between Morano and himself.

These contradicting statements leave the Court with only one possible conclusion—the material facts are so in dispute as to preclude any summary judgment finding.  Taking the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff did, in fact, secure multiple contracts for USBP from which USBP benefitted and for which Plaintiff never received his promised compensation.  While Plaintiff's evidence is again weak at best, the fact remains that a final determination requires multiple credibility determinations.

Certainly, both Plaintiff and Defendants had personal knowledge of the facts to which they attest. Moreover, while Defendants have clearly produced more direct evidence in support of their position, Plaintiff has provided sufficient circumstantial facts from which a jury can find that Plaintiff's story is credible. In any event, it remains beyond the Court's purview to grant summary judgment at this juncture.

### 3. Conclusion as to Breach of Contract Claim

While Plaintiff's bare evidentiary showing has caused the Court to seriously entertain the grant of summary judgment in this case, the well-settled interpretations of Federal Rule of Civil Procedure 56 require that the case be submitted to a jury for consideration. Crediting Plaintiff's testimony and Declaration, together with the circumstances involving his work for USBP, his attendance at business meetings, and his obvious involvement with USBP business, a jury could reasonably conclude that some arrangement or contract existed wherein Plaintiff was promised one-third of the profits on all contracts and distribution channels he obtained. Moreover, while Defendants' evidence certainly appears to contradict many of Plaintiff's claims about the quantity of business he brought in, Plaintiff has offered enough evidence to substantiate a jury finding that he did indeed generate business for which he was not compensated. Ultimately, should the jury find that Plaintiff is entitled to damages, Plaintiff will bear the burden of proving his damages. At this stage of the litigation, however, the Court finds that summary judgment is inappropriate.

### C. Pennsylvania Wage Payment and Collection Law

In an alternative to his breach of contract claim, Plaintiff seeks relief under the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa.C.S. § 260.1 et seq. The WPCL requires employers to pay a separated employee his or her "wages or compensation

earned" at the time of separation no later than the employer's next regular payday. 43 Pa. Cons. Stat. Ann. § 260.5. The WPCL defines wages as "all earnings of an employee" regardless of how they are determined. Id. § 260.2a. Wages also include fringe benefits provided by an employer. Id. Defendants now contend that Plaintiff's claim under the WPCL fails in two respects: (1) it is time barred, and (2) Plaintiff is not an "employee" for purposes of the WPCL's protection.

With respect to the first argument, 43 Pa.C.S. § 260.9a(g) of the WPCL states: "No administrative proceedings or legal action shall be instituted under the provisions of this act for the collection of unpaid wages or liquidated damages more than three years after the day on which such wages were due and payable as provided in sections 3 and 5." Plaintiff's Amended Complaint alleges that the purported agreement was breached in March 2007 and that the monies owed to him at that time were "wages" to which he is now entitled to collect under the WPCL. (Am. Compl. ¶¶ 20, 22, 38–39.) The current action was then initiated on March 15, 2007. Accordingly, Plaintiff may bring a WPCL cause of action for any wages due any payable to him from March 15, 2007 forward. As neither party has pinpointed the exact date on which the claimed wages were owed to Plaintiff, the Court declines to find this cause of action barred by the statute of limitations.[7]

Defendants' second argument, however, has significantly more merit. "The WPCL applies only to employees, not to independent contractors." Spyridakis v. Riesling Grp., Inc.,

_____

[7] Plaintiff makes the bald argument that "there are certainly some documents indicating that [Plaintiff's contract] may not have been wrongfully terminated until after March, 2007." (Pl's Opp'n Summ. J. 15.) In support of this statement, Plaintiff cites to random pages from an exhibit without any explanation to the Court of what these documents prove. As this Court will not attempt to decipher the meaning of cryptic citations to smatterings of email documents, we disregard this argument by Plaintiff.

398 F. App'x 793, 798 (3d Cir. 2010). In deciding whether an individual is an employee or an

independent contractor under the WPCL, Pennsylvania courts have looked to a series of factors,

including:

> [T]he control of the manner that work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether the work is part of the regular business of the employer, and the right to terminate the employment at any time.

Morin v. Brassington, 871 A.2d 844, 850 (Pa. Super. Ct. 2005) (quoting Lynch v. WCAB, 544

A.2d 159, 160 (Pa. Commw. Ct. 1989); see also Inoff v. Craftex Mills, Inc., No. Civ.A.06-3675,

2007 WL 4355385 , at *11 (E.D. Pa. Dec. 11, 2007). "Paramount for [the court's] consideration

among these factors is the right of an individual to control the manner that another's work is to

be accomplished." Morin, 871 A.2d at 850.

In the present case, Plaintiff has not established, based on the record evidence, that he

was an employee of USBP. Plaintiff contends that USBP supplied the "tools of the trade" by

providing advertising and lead sources for Plaintiff, paying for Plaintiff's membership at the

Pyramid Club for Plaintiff to recruit agents for USBP, and fully subsidizing Plaintiff's business

trips on behalf of USBP to Florida, Chicago, and Las Vegas. This singular factor standing alone,

however, does not rise to the level of an employer-employee relationship, particularly given the

complete absence of evidence that USBP controlled the manner of Plaintiff's work. As noted

above, Plaintiff worked in a different state, was paid based on commissions rather than time,

worked on his own hours, and acted as an insurance agent rather than a company employee.

Further, Plaintiff conceded that he never received a W-2 form, which reports employee income,

from USBP, but received only a 1099 form, which reports, *inter alia*, self-employment earnings. (Guzzi Dep. 39:9–41:12.) Plaintiff was also explicit that the money he got from USBP was not salary. (Id. at 92:22–93:10.)

Simply put, having already adamantly advocated in favor of his status as a full partner of USBP who worked on his own time and conditions and who was entitled to profit sharing, Plaintiff is now hard-pressed to argue that he meets the definition of "employee" for purposes of the WPCL claim. In fact, the Court has already found that a genuine issue of material fact exists as to whether there was an oral contract between Plaintiff and USBP for some type of profit sharing. Plaintiff simply cannot have it both ways at this point in the litigation. See Lewis v. UPMC Bedford, No. Civ.A.07-13, 2009 WL 840385, at *13 (W.D. Pa. Mar. 30, 2009) (noting that where plaintiff, during summary judgment proceedings, asserted his status as an independent contractor for maintenance of one claim, he could not establish that he was an employee for purposes of his WPCL claim). As such, the Court must conclude that Plaintiff's working relationship with USBP is properly characterized as that of an independent contractor and not an employee. In turn, Defendants are entitled to summary judgment on the WPCL claim.

### D. Claim for a Legal Accounting

Finally, Defendants seeks summary judgment on Plaintiff's claim for a legal accounting. Pennsylvania Rule of Civil Procedure 1021 provides for the right to demand an accounting at law: "Any pleading demanding relief shall specify the relief to which the party deems himself entitled. Relief in the alternative or of several different types, including an accounting, may be demanded." Pa. R. Civ. P. 1021(a). To establish a right to an accounting in a breach of contract case, the plaintiff must show that:

(1)     there was a valid contract, express or implied between the parties whereby the defendant

      (a)     received monies as an agent, trustee or in any other capacity whereby the relationship created by the contract imposed a legal obligation upon the defendant to account to the plaintiff for the monies received by the defendant, or

      (b)     if the relationship created by the contract between the plaintiff and defendant created a legal duty upon the defendant to account and the defendants failed to account and the plaintiff was unable, by reason of the defendant's failure to account, to state the exact amount due him, and

(2)     that the defendant breached or was in dereliction of his duty under the contract.

Pollock v. Energy Corp. of Am., No. Civ.A.10-1553, 2011 WL 5977422, at *1–2 (W.D. Pa. Nov. 29, 2011) (quoting McGough v. Broadwing Commc'ns, Inc., 177 F. Supp. 2d 289, 301 (D.N.J. 2001)) (further quotations omitted).

In the present case, the Court has found that a genuine issue of material fact remains as to Plaintiff's breach of contract claim. Should a jury conclude that Defendant USBP did indeed breach a contract with Plaintiff, Plaintiff may be able to establish his right to a legal accounting. Accordingly, the Court denies this portion of the Motion for Summary Judgment.

## IV.     CONCLUSION

In light of the foregoing, the Court will grant Defendants' Motion for Summary Judgment in part and deny it in part. First, the Court finds that no basis exists—either under a piercing the corporate veil theory or a participation theory—upon which to impose individual liability on Defendant Morano. As such, judgment is entered in his favor and against Plaintiff on the breach of contract claim. Second, the Court finds that Plaintiff has managed to create a genuine issue of

material fact as to whether a contract existed between Plaintiff and USBP and whether USBP breached that contract causing damage to Plaintiff. Therefore, the Court denies Defendants' Motion for Summary Judgment on this claim. Finally, with respect to the WPCL claim against both Defendants, the Court holds that Plaintiff has failed to establish that he is an "employee" for purposes of maintaining a WPCL cause of action. Thus, judgment on this claim shall be entered in favor of Defendants and against Plaintiff.

An appropriate Order follows.